OPINION OF THE COURT
Jack M. Battaglia, J.
Perhaps the most noteworthy aspect of this decision and order is that, by stipulation of the parties, it resolves an important *550 threshold question for purposes of several hundred actions pending between them in this and other courts. In each of the actions, plaintiff health care provider, Andrew Carothers, M.D., P.C., seeks to recover payment from defendant GEICO Indemnity Company of first-party no-fault benefits that have been assigned to plaintiff and that plaintiff has allegedly assigned to two third parties, Medtrx Capital, LLC and Medtrx Provider Solutions, LLC (now known as Advanced Healthcare Solutions, LLC). GEICO has moved for summary judgment of dismissal on the ground that, by reason of the assignments, plaintiff is not a real party in interest, and cannot, therefore, maintain the actions.
In a stipulation dated July 14, 2006, the parties agreed that this decision and order “shall be controlling upon the parties ... in actions wherever venued, and . . . shall have the binding effect of collateral estoppel and be dispositive of the issues presented,” subject to the “rights of either party to appeal.” The court commends the parties and their counsel for recognizing that an avalanche of first-party no-fault actions has virtually buried the lower trial courts, and for acting responsibly to alleviate that burden to some degree by choosing a single action in which to resolve a significant issue. It may be that these and other parties and their counsel will be able to identify, perhaps in combination, issues that might be most effectively resolved in a designated fully-litigated action, in a manner that would serve their own interests and that of the courts.
According to Neal Magnus, the chief executive officer of Medtrx, LLC, Medtrx Capital, LLC and Advanced Healthcare Solutions, LLC, the plaintiffs relationship with those companies (individually and collectively called Medtrx here) is reflected in three documents: an amended and restated loan and security agreement dated as of January 18, 2006; a revolving credit note dated April 20, 2005; and a billing and collection agreement dated as of April 20, 2005. (See affidavit of Neal Magnus, dated July 10, 2006, at 2.) A loan and security agreement and promissory note executed in February 2005 were “incorporated and subsumed,” in Mr. Magnus’s words, in a loan and security agreement dated as of April 20, 2005 that was amended and restated by the January 2006 agreement. (See id. at 1-2.) In April 2005, Andrew Carothers, M.D. executed a guaranty in which he “unconditionally guarantees” payment of amounts due under the note, and the guaranty remains effective. (See loan agreement § 1.5; affidavit of Neal Magnus at 3; affidavit of Andrew Carothers, M.D., dated May 3, 2006, ¶ 11.)
*551 The note “evidences [plaintiffs] unconditional obligation to repay [Medtrx] for all Obligations,” as defined in the loan agreement. (Note ¶ 3.) The note “is secured by the Collateral,” also as defined in the loan agreement. (Id. ¶ 6.) Under the loan agreement, the “Obligations” include “all Advances and other extensions of credit to or for the benefit of [plaintiff] pursuant to [the] Agreement.” (Loan agreement § 1.2.) “Advances” are “cash advances” made to plaintiff from time to time in Medtrx’s “sole discretion.” (Id. § 2.1.) Each advance is “due and payable” on the first business day following the date that is 12 months after the applicable “Advance Date.” (Id. § 2.2.)
“As security for the full and timely payment and satisfaction of the Obligations,” plaintiff
“assigns, pledges, transfers, grants, bargains, and sells, mortgages, conveys, aliens [sic], releases and sets over unto [Medtrx], and . . . grants and creates in favor of [Medtrx], a continuing, direct and exclusive, first priority and paramount security interest in and to . . . [all] of [plaintiffs] Accounts . . . [and] [a] 11 proceeds of such Accounts.” (Id. § 5.1.)
An “Account” is defined as “any right to payment of a monetary obligation which was or is created or otherwise arose or arises out of [plaintiffs] providing bonafide Medical Services,” defined to include “medical and health care services . . . covered by a policy of insurance issued by an Insurer.” (Id., schedule 1 [defined terms].) If plaintiff should breach certain representations or obligations with respect to any account, Medtrx “shall have the right ... to reassign the impacted Account to [plaintiff] . . . [and] an amount equal to the full amount of the monetary obligation underlying such impacted Account shall be due and payable.” (Id. § 2.5.)
According to Mr. Magnus, “[s]ince the inception of the relationship” between plaintiff and Medtrx, advances made to plaintiff have “never exceeded 40% of the value of the claims securing the loan” and “the current loan balance is less than 28% of the collateral securing it.” (Affidavit of Neal Magnus at 2.) Defendant has made no showing that the security to loan ratio, or any other aspect of the financing arrangement, including the facility fee of “10% of the Advance amount” (loan agreement § 1.4), fails to conform with custom and practice for such arrangements in the business community.
“Both institutional and individual healthcare *552 providers may find themselves with a need for capital due to a variety of factors, such as delays in receipt of reimbursement from payors, the need to pay vendor debt, or the desire to refinance an existing credit facility. Financing the provider’s patient accounts receivable is one way to generate needed capital. . .
“Accounts receivable financings are secured by patient accounts receivable of the provider . . .
“[T]hese financings are generally structured as lines of credit.” (Judith A. Eisen and Christina VanVort, When a Provider Needs Capital: Financing Patient Accounts Receivables Can Be The Way To Go, NYLJ, July 10, 2006, at 10, col 1.)
According to Dr. Carothers, “due to the current health care situation in this country and the long delay in payment on legitimate claims by GEICO (and other insurance companies), [plaintiff] must obtain loans during its cash flow cycles . . . GEICO rejects (90%) of all No-Fault claims filed” by plaintiff. (Affidavit of Andrew Carothers, M.D. ¶ 11, 12.)
“As a condition of this type of financing, lenders will often require that the provider’s collections on accounts receivable pass through the lender’s control.” (Eisen and VanVort, supra, at 10, col 1.) Here, the loan agreement requires the billing and collection agreement, which provides for the services that its name suggests. (Loan agreement § 4.1 [a].) That agreement gives Medtrx the power “[t]o collect all ‘no fault’ or ‘PIP’ claims . . . for reimbursement or indemnification from all third party payors for medical services provided by [plaintiff] in [plaintiffs] name and on its behalf.” (Billing and collection agreement § 2.2 [c] [ii].) Medtrx is compensated for these services by a flat fee “per line item” (id. § 3.1) and “30% of the aggregate amount collected” on a “Past Due Claim” (id. § 3.2).
“So long as any sum which may be due under [the billing and collection] Agreement remains unpaid, [Medtrx] shall have, to the extent authorized by law, a continuing security interest in the accounts receivable” of plaintiff. (Billing and collection agreement § 3.5.) Plaintiff’s accounts, therefore, secure payment of the cash advances and related facility fees under the loan agreement, and payment of the fees due under the billing and collection agreement. There is no provision in the billing and collection agreement, however, for assignment of the accounts, presumably because they are assigned to a different Medtrx company under the loan agreement.
*553 In addition to the terms of the loan agreement and the security interest in plaintiffs accounts, the loan agreement and the billing and collection agreement are linked by a required lock-box arrangement. (Loan agreement § 4.1 [b]-[e]; §§ 4.2-4.5; billing and collection agreement § 2.2 [a]; § 3.4.) The two agreements provide for the regular distribution of funds in the lockbox to Medtrx and plaintiff. (Loan agreement § 4.1 [d], [e]; billing and collection agreement § 3.4 [a].) Although plaintiff has “sole dominion and control over the lockbox” (loan agreement § 4.2), if plaintiff cancels or changes the transfer instructions to the bank without Medtrx’s consent, there will be a material default under both agreements (id.; billing and collection agreement § 3.4 [b]).
Defendant has made no showing that the billing and collection agreement, or the lockbox arrangement in both agreements, fail to conform to custom and practice for such arrangements in the business community. Under article 9 of the Uniform Commercial Code, the assignee of an account may collect payment of the account both before and after default on the obligation secured by the account. (See UCC 9-406, 9-607; General Motors Acceptance Corp. v Clifton-Fine Cent. School Dist., 85 NY2d 232, 236 [1995].) “It is not unusual for debtors to agree that secured parties are entitled to collect and enforce rights against account debtors prior to default.” (UCC 9-607, Comment 4.)
The cited Code provisions do not apply, however, to “an assignment of a health care insurance receivable to the extent such assignment conflicts with other law.” (See UCC 9-406 [h] [1].) A “health care insurance receivable” is “an interest in or claim under a policy of insurance which is a right to payment of a monetary obligation for health-care goods or services provided.” (UCC 9-102 [a] [46].) The Code applies generally to assignments of health care insurance receivables (see UCC 9-109 [d] [8]), except where treated specially (see UCC 9-309 [5]; 9-404 [e]; 9-405 [d]; 9-406 [h]; 9-408).
Defendant contends that plaintiffs assignment of its accounts to Medtrx is “improper” by reason of applicable regulation and Appellate Term’s decision in A.B. Med. Servs. PLLC v Liberty Mut. Ins. Co. (9 Misc 3d 36 [App Term, 2d & 11th Jud Dists 2005]). (Affirmation in support of amended motion ¶¶ 36-39.) The regulation provides that “[a]n insurer shall pay benefits . . . directly to the applicant . . . , or, upon assignment by the applicant . . . , shall pay benefits directly to providers of health care services.” (11 NYCRR 65-3.11 [a].)
*554 In A.B. Med., the court held that a health care provider is not entitled to “direct payment” of assigned no-fault benefits from an insurer when the medical services were not performed by the provider or one of its employees but by an independent contractor, stating that “[t]here is no authorization ... in the insurance regulations, entitling the assignment of no-fault benefits by a provider.” (A.B. Med. Servs. PLLC v Liberty Mut. Ins. Co., 9 Misc 3d at 37; see also Rockaway Blvd. Med. P.C. v Progressive Ins., 9 Misc 3d 52, 54 [App Term, 2d & 11th Jud Dists 2005] [“A defense that a plaintiff in an assigned first-party no-fault action may not maintain the action because it is not a ‘provider’ within the meaning of the insurance regulations, and hence that no-fault benefits are not assignable to it, is nonwaivable and not subject to the preclusion rule”].)
But the issue here is not whether Medtrx as assignee is entitled to “direct payment” or to maintain this action in its own name. It quite clearly is not, and plaintiff does not contend that it could be. And Appellate Term’s expansive statement that the insurance regulations contain “no authorization . . . entitling the assignment of no-fault benefits by the provider,” even if not limited to its context, cannot be read even as dictum that the insurance regulations prohibit the assignment. There is nothing in A.B. Med. or subsequent decisions on the issue that suggests that, as between the assignor patient and assignee provider, the assignment is not fully effective for purposes other than “direct payment,” even though the services may have been rendered by an independent contractor.
More importantly for this motion, defendant’s argument proves too much. “The test for determining the real party in interest is whether payment to the plaintiff will protect the defendant from having to defend against the same claim a second time, and whether such payment will bar all claims of all others.” (Chalmers v Eaton Corp., 71 AD2d 721, 722 [3d Dept 1979]; see also Sheridan v Mayor of City of N.Y., 68 NY 30, 32 [1876]; General Inv. Co. v Interborough R.T. Co., 200 App Div 794, 802 [1st Dept 1922], affd 235 NY 133 [1923]; Sardanis v Sumitomo Corp., 282 AD2d 322, 323 [1st Dept 2001]; Facilities Dev. Corp. v Oosterbaan, 132 Misc 2d 923, 927 [Sup Ct, Clinton County 1986]; Purfield v Kathrane, 73 Misc 2d 194, 197-198 [Civ Ct, NY County 1973]; Estate of Schmulevich v Citibank, N.A., 1990 WL 160886, *1-2, 1990 US Dist LEXIS 13869, *2-3 [SD NY 1990].) “So long as the wrongdoer against whom the cause of action is asserted is not subjected to the danger of a *555 double recovery, he is in no position to complain.” (Sosnow, Kranz & Simcoe v Storatti Corp., 269 App Div 122, 126 [1st Dept 1945]; see also Fox v McGrath, 152 F2d 616, 619 [2d Cir 1945].)
Here, as GEICO correctly demonstrates, Medtrx is not entitled to direct payment of no-fault benefits from GEICO or any other insurer; any claim submitted by Medtrx could safely be denied, and any action instituted by Medtrx in its own name to recover no-fault benefits would presumably be dismissed. Since it cannot be that, by engaging in a legitimate and customary financial transaction, plaintiff has effectively immunized GEICO from suit for wrongful refusal to pay no-fault benefits required by state law and policy, then if Medtrx cannot sue, plaintiff must be able to.
Morever, it has long been the law that “an assignment of a chose in action, or of an interest therein, as security for the payment of a debt, is a mere pledge. The assignor still retains an interest which he can assert in a suit.” (Mercantile Trust Co. v Gimbernat, 143 App Div 305, 308 [1st Dept 1911], affd 206 NY 722 [1912]; see also Peck v Yorks, 75 NY 421, 424 [1878]; Agristor Leasing v Barlow, 180 AD2d 899, 900 [3d Dept 1992]; Southern Assoc. v United Brands Co., 67 AD2d 199, 204 [1st Dept 1979]; Fifty States Mgt. Corp. v Pioneer Auto Parks, 44 AD2d 887, 888 [4th Dept 1974]; Anders v State of New York, 42 Misc 2d 276, 280 [Ct Cl 1964]; Aster Agency v State of New York, 12 Misc 2d 44, 46 [Ct Cl 1958].)
It is essentially defendant’s position on this motion that the assignment and security interest in the loan agreement, and the security interest in the billing and collection agreement, are not what they purport to be. “If, as between the assignor and the assignee, the transfer is complete, so that the former is divested of all control and right to the cause of action, and the latter is entitled to control it and receive its fruits, the assignee is the real party in interest.” (Cummings v Morris, 25 NY 625, 627 [1862]; see also Cardtronics, LP v St. Nicholas Beverage Discount Ctr., Inc., 8 AD3d 419, 420 [2d Dept 2004]; Aster Agency v State of New York, 12 Misc 2d at 46.) Defendant bears the burden of persuading the court that plaintiff has so divested itself of any interest in its accounts that it should not be permitted to maintain this action. (See Matter of Weinstock, 283 AD2d 510, 510 [2d Dept 2001]; Brignoli v Balch, Hardy & Scheinman, 178 AD2d 290, 290-291 [1st Dept 1991].)
A security interest is “an interest in personal property or fixtures which secures payment or performance of an obliga *556 tion.” (UCC 1-201 [37].) By their express terms, the two agreements here so characterize the transactions (see loan agreement § 5.1; billing and collection agreement § 3.5), and the principals of the parties so understand them (see affidavit of Neal Magnus, dated July 10, 2006, at 1-4; affidavit of Andrew Carothers, M.D., May 3, 2006, ¶¶ 11, 18).
Defendant contends nonetheless that plaintiff has “no interest in the suit” because “an assignment of all interest has been effected.” (Affirmation in support of amended motion ¶¶ 22, 35.) In support, defendant argues that Medtrx “retains control over the disposition of funds deposited in the [lockbox] account” (id. ¶ 30; see also reply affirmation ¶¶ 14, 15, 16); that Medtrx “decides if, and when, to put an unpaid no-fault claim into suit; . . . whether to settle a case; and the amount of the settlement” (id. ¶ 20; see also id. ¶ 21); and that Medtrx “pays [plaintiff] up to 40% of the face value of the bill. . . and retains the remaining 60% in fees and assorted charges.” (Affirmation in support of amended motion ¶ 21; see also reply affirmation ¶ 10.) In considering defendant’s contentions and arguments, and for purposes of this motion only, the court will ignore the apparent separate corporate existence of the Medtrx parties to the operative agreements. The court notes again that the billing and collection agreement is a condition of the loan agreement (see loan agreement § 4.1 [a]), and that there is apparently a single lockbox account for the deposit and distribution of account payments for purposes of both agreements (see loan agreement § 4.1 [b], [d]).
Beginning with the lockbox account, there is no question that the funds deposited into the lockbox account will be paid to Medtrx to satisfy plaintiffs obligation to repay advances, and to pay fees accrued under the two agreements, before any funds are paid to plaintiff. (See loan agreement § 3.1 [a]; § 4.1 [d]; billing and collection agreement § 3.4 [a].) Indeed, Medtrx is “entitled to accept prepayment of all or any portion of any outstanding Advance out of funds in the Lockbox that are attributable to collections of the Account(s) underlying such Advance” (see loan agreement § 2.2), which may explain why only the facility fee, and no interest, is payable if the advance is paid at or before maturity (see id. §§ 1.4, 3.1 [b]). But, despite defendant’s suspect mathematical calculations (discussed below), both agreements recognize plaintiff’s interest in the lockbox funds to the extent they exceed amounts due to Medtrx.
Plaintiff, moreover, maintains “sole dominion and control” over the lockbox account, and should it “terminate[ ] the Lock- *557 box or cancel[ ] or change[ ] the automatic transfer instructions” required by the agreements, plaintiff will be deemed in material default of the agreements. (See loan agreement § 4.2; billing and collection agreement § 3.4 [b].) On such default, in addition to other remedies at law, “all Obligations will be immediately due and payable.” (See loan agreement §§ 7.1, 7.2.)
Defendant is also correct that the billing and collection agreement gives Medtrx significant control over the collection of accounts, including the “discretion, in [plaintiffs] name and on its own behalf, [to] adjust the outstanding balance of [any] Past Due Claim or otherwise settle or compromise all or any portion of any Past Due Claim, as [Medtrx] in its reasonable discretion determines to be appropriate” (billing and collection agreement § 2.2 [b]); and the authority to “[s]elect, coordinate with and direct legal counsel -with respect to fee dispV.es and/or arbitration and litigation” (see id. § 2.2 [d] [v]). But “[t]he grant of a power of attorney ... is not the equivalent of assignment of an ownership.” (Advanced Magnetics, Inc. v Bayfront Partners, Inc., 106 F3d 11, 17-18 [2d Cir 1997]; see also Airlines Reporting Corp. v Pro Travel, 239 AD2d 233, 234 [1st Dept 1997].)
The addition of a security interest does not convert an agency into ownership. The right to “enforce the obligations of an account debtor” may be granted to a secured party by agreement, to be exercised before, as well as after, a default by the primary debtor. (See UCC 9-607 [a] [3]; UCC 9-607, Comment 4.) Any discretion given to the secured party must be exercised “in a commercially reasonable manner” (see UCC 9-607 [c]), and should the secured party recover more than is owed (together with allowable expenses), the surplus must be paid to the primary debtor (see UCC 9-608 [a]). These obligations of Medtrx as a secured party cannot be waived or varied. (See UCC 9-602.)
At the end of the day, however, defendant’s arguments based upon distribution of funds from the lockbox and control over collection of accounts depend upon the extent of the interest that plaintiff maintains in the accounts, and defendant has not shown that plaintiffs interest is not both substantial and real. Defendant’s statement that Medtrx “pays [plaintiff] up to 40% of the face value of the bill . . . and retains the remaining 60% in fees and assorted charges” (affirmation in support of amended motion ¶ 21) is in part disingenuous and in part unestablished. Although Mr. Magnus acknowledges that advances have been made to plaintiff that reach 40% of the value of the accounts securing them (see affidavit of Neal Magnus at 2), *558 those advances must be repaid, and Medtrx’s interest is as security for payment. And defendant makes no attempt to show that “fees and assorted charges” consume 60% of the “face value” of the accounts.
Elsewhere, defendant states that the Medtrx companies “collectively own 70% of the unpaid bills,” supposedly consisting of “monies equal to 40% of the unpaid bills” as advances and a “30% interest in the unpaid bills” as its collection fee for past due claims. (Reply affirmation ¶ 10.) But, again, the amount of the advances as a percentage of the total value of the accounts is not “ownership,” but a secured loan. And Medtrx only earns 30% of the amount of a claim when “specialized and additional collection services” are required (see billing and collection agreement § 3.2); when the bills are paid, and only “standard” collection measures required, Medtrx is compensated only by the basic fee of “$44.50 per line item” (see id. at § 3.1).
The singular deficiency in defendant’s arguments and contentions is that they are not supported by a showing that the advances, fees, or any other provision of the loan or billing and collection agreement, separately or together, fail to conform with custom and practice for secured working capital financing. As previously noted, health care insurance receivables are recognized and treated as a somewhat unique species of account by article 9 of the Uniform Commercial Code. The explosion of no-fault litigation suggests that billings and claims for first-party benefits represent a unique subspecies.
The interrelated terms and conditions of accounts receivable financing reflect assessments as to the certainty and ease of collection. “The borrowing base is the lender’s calculation of the provider’s borrowing ability based on the amount the provider is expected to collect (based on historical collection data) on its eligible receivables outstanding at the time, which amount is discounted to provide a cushion to the lender” (Eisen and VanVort, supra at 10, col 1). Here, for example, plaintiffs principal states that “GEICO rejects (90%) of all No-Fault claims filed” by plaintiff (affidavit of Andrew Carothers, M.D. ¶ 12); and Medtrx’s principal states that “[s]ince February 2005 [plaintiff] has been paid on 16.22% of claims submitted to GEICO without the requirement of commencing a legal action to procure payment” (affidavit of Neal Magnus at 4). We do not know the extent to which plaintiffs accounts are comprised of first-party benefits claims, or the collection rate on bills submitted to other insurers.
*559 Neither defendant nor the court can fairly conclude on this record that the financing arrangement reflected in the loan agreement, note, and billing and collection agreement, together with the guaranty of plaintiff’s principal, is unreasonable or otherwise illegitimate. Since Medtrx is precluded by current regulation from collecting direct payment of no-fault benefits, a ruling that it cannot recover benefits in the name of the provider would almost certainly undermine, if not destroy, financing arrangements like that at issue and the health care practices that depend upon them. Some, perhaps, would consider that desirable, but that is not an objective that current law and policy direct the courts to seek, and not one that should be risked without full exploration and consideration of the facts and expert description and assessment of commercial reality. Current regulations and rules of disclosure allow insurers, with appropriate foundation, to develop the necessary facts and opinion.
Defendant’s motion to dismiss on the ground that plaintiff is not a real party in interest must, therefore, be denied. Particularly since it is clear from the stipulation that the parties intended that this motion resolve the issue for the pending cases at least, the court grants summary judgment to plaintiff on the issue. (See CPLR 3212 [b], [e].)